On September 14, 2004, this Court granted the petition of the State of Alabama for a writ of certiorari to examine the argument by the State that the Court of Criminal Appeals had erred in reversing the trial court's judgment convicting James Dwight McKissack of murder, see Ala. Code 1975, § 13A-6-2(a)(1), and sentencing him to life imprisonment. In its opinion, McKissackv. State, 926 So.2d 361 (Ala.Crim.App. 2004), the Court of Criminal Appeals set out the following facts:
 "[McKissack] argues that the trial court improperly denied his request that *Page 368 
the grand jury proceedings in his case be preserved. In support of his motion [to preserve the grand-jury proceedings], which he filed before the grand jury proceedings occurred, he asserted that he and Michael Craig had been arrested and charged with manslaughter and that they had both made statements on the night they were arrested about their involvement in the offense. [McKissack] stated that he, Craig, and the victim had been drinking and shooting his revolver; that they had started playing a game of Russian roulette; that they had all fallen asleep in their vehicle; that he was awakened by a gunshot and saw the victim in the seat beside him bleeding from his head; and that he had awakened Craig. Craig stated that [McKissack] and the victim had been playing Russian roulette; that he had fallen asleep; and that [McKissack] had awakened him and told him that the victim had shot himself. [McKissack] also asserted that, during the preliminary hearing, an investigator testified that he believed that [McKissack] intentionally shot the victim because the preliminary autopsy report indicated that there was not any soot or stippling around the gunshot wound like a person would expect from a contact wound. He further asserted that his counsel had talked to the medical examiner who had performed the autopsy of the victim's body; that the medical examiner had stated that he had not been able to determine the manner of the victim's death; that, although there was not any soot or stippling around the gunshot wound, there was an abrasion ring, which was consistent with the barrel of the revolver having been placed against the skin; that the trajectory of the bullet made him wonder whether or not the wound was self-inflicted; and that, in his report, he had listed the manner of death as being `inconclusive.' (C.R. 20.) Finally, he concluded:
 "`It is particularly important to transcribe the proceedings in a case like this, where the state is considering elevating the charges to murder, and the state's main witness, [the medical examiner], has told counsel on two occasions that he cannot determine the manner of death. If the state has a witness that would contradict [the medical examiner's] testimony, or presents forensic evidence that would do so, or if [the medical examiner], himself, gives different testimony, counsel should be entitled to a verbatim record of it, or of anything else that is said. Anything else would be unfair and a violation of Due Process.'
"(C.R. 26.)
 "During a hearing on [McKissack's] motion, defense counsel stated:
 "`At this point, we're just asking that [the grand jury testimony] be preserved. I think that before we would be entitled to it we'd have to make a threshold showing under the caselaw, and while I can make a showing, I think, which would justify preserving it, we can only make that showing really at trial as to whether or not we're entitled to discovery of any kind of transcript. Right now we're just asking that it be preserved.
"`. . . .
 "` . . . And I'm not saying that it needs to be done in every case, but in this particular case where we think there is a good chance that the district attorney is gonna elevate the charges and attempt to get an indictment on murder — I don't think on capital murder but I can't be one-hundred percent for sure, and in which I spoke to the medical examiner on a number of occasions and he's indicated that he *Page 369 
cannot determine the manner of death, that there are some things that are consistent with it being a contact wound and self-inflicted wound. This is the Russian roulette case, and some things which indicate that it's intentional. Under those circumstances and under the circumstances there's some testimony that came out at the preliminary hearing by the investigator which we have concerns about, all we're asking for is that it be preserved. And I know that there is issues about secrecy of grand jury proceedings. We're not asking for it to be divulged. We're not even asking that we get it. We're asking that it be preserved so that if the issue comes up, and we think it will, as to whether or not a witness has testified honestly, that we'll have access to that information.'
 "(R. 6-9.) Subsequently, defense counsel explained to the trial court, ex parte, that she was concerned about potential inconsistencies in the testimony of the medical examiner and/or the investigator who had testified during the preliminary hearing. Subsequently, the trial court denied [McKissack's] motion."
926 So.2d at 361-63. After the trial court denied his motion to preserve, McKissack petitioned the Court of Criminal Appeals for a writ of mandamus directing the trial judge to order the district attorney to preserve the grand-jury testimony at issue, but that court denied the petition without an opinion on February 19, 2002. McKissack v. State (No. CR-01-1053), 854 So.2d 1232
(Ala.Crim.App. 2002) (table).
In addressing McKissack's argument on direct appeal that the trial court erred in failing to preserve the grand-jury testimony in question, the Court of Criminal Appeals recognized the general rule that grand-jury proceedings are not discoverable by the defense:
 "`The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret.' Steward v. State, 55 Ala.App. 238, 240, 314 So.2d 313, 315 (Ala.Crim.App. 1975). In fact, the Legislature has specifically recognized the importance of protecting the sanctity of grand jury proceedings. Section 12-16-214, Ala. Code 1975, provides:
 "`The Legislature hereby finds, declares and determines that it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate. The provisions of this division are to be construed for the accomplishment of this purpose and to promote the following:
 "`(1) That grand juries have the utmost freedom in their discussions, deliberations, considerations, debates, opinions and votes without fear or apprehension that the same may be subsequently disclosed, or that they may be subject to outside pressure or influence or injury in their person or property as a result thereof.
 "`(2) That those persons who have information or knowledge with respect to the commission of crimes or criminal acts be encouraged to testify freely and truthfully before an appropriate grand jury without fear or apprehension that their testimony may be subsequently disclosed, or that they may be subject to injury in their person or property as a result thereof.
 "`(3) That those persons who have committed criminal acts or whose indictment may be contemplated *Page 370 
not escape or flee from the due administration of justice.
 "`(4) That those persons falsely accused of criminal acts are not subject to public scrutiny or display and their otherwise good names and reputations are left intact.'"
926 So.2d at 363. We note that the State has cited in its brief to this Court many cases in addition to Steward v. State,55 Ala.App. 238, 314 So.2d 313 (Ala.Crim.App. 1975), that stand for the principle that, in the absence of a statutory provision, preservation of grand-jury testimony is not required. See, e.g.,State v. Sharp, 893 So.2d 566 (Ala.Crim.App. 2003); Robinsonv. State, 865 So.2d 457 (Ala.Crim.App. 2003); and Stallworth v.State, 868 So.2d 1128 (Ala.Crim.App. 2001) (opinion on return to second remand).
However, the Court of Criminal Appeals also recognized that the general rule governing the secrecy of grand-jury proceedings is subject to a limited exception upon a defendant's showing of a "particularized need," as discussed in Arthur v. State,711 So.2d 1031, 1078-79 (Ala.Crim.App. 1996), aff'd,711 So.2d 1097 (Ala. 1997):
 "While it is true that broader discovery is to be allowed in cases involving capital murder because of the possible imposition of the death penalty, Ex parte Monk, 557 So.2d 832, 836-37 (Ala. 1989), a defendant must make a preliminary showing of particularized need before a court can balance this need against the policy favoring grand jury secrecy. Cf. In re Disclosure of Evidence, 650 F.2d 599, modified, 662 F.2d 362 (5th Cir. 1981) (pursuant to Rule 6(e)(3)(C)(i), Federal Rules of Criminal Procedure, matters before a grand jury may be disclosed by court order preliminary to, or in connection with, a judicial proceeding when a showing has been made of `particularized need' and `compelling necessity'; however, the policies favoring the secrecy [of] grand juries must still be given weight. Id. at 601.).
 "`Before a defendant is allowed to inspect a transcript of a State's witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959)] and Pate [v. State, supra, 415 So.2d 1140 (Ala. 1981)], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant's testimony. In this case no such showing was made and the existence of any inconsistency between the witness' trial and grand jury testimony was never even alleged. Cooks [v. State, supra, 50 Ala.App. 49, 276 So.2d 634 (1973)]. Also, there was no showing that the witness' grand jury testimony, if available, was "of such nature that without it the defendant's trial would be fundamentally unfair." Cooks, 50 Ala.App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321
(1924) ("Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.")
 "`In laying the proper predicate for examination of a witness' grand jury testimony, it should also be established *Page 371 
that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
 "`"When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error." Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437 [(1966)], cert. dismissed, 280 Ala. 718, 197 So.2d 447 (1967).
 "`Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury "differed in any respects from statements made to the jury during trial," Pate, supra, and (2) whether the grand jury testimony requested by the defendant "was of such a nature that without it the defendant's trial would be fundamentally unfair." Pate, supra.
This procedure will best preserve and protect the legislative determination that "it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate." Alabama Code 1975, Sections 12-16-214 through 226.'
 "Millican v. State, 423 So.2d 268, 270-71
(Ala.Cr.App. 1982)."
The Court of Criminal Appeals noted that a defendant cannot make the showing required by Millican v. State, 423 So.2d 268
(Ala.Crim.App. 1982), until after a witness has testified at trial. However, the court recognized that
 "`[a] Grand Jury is not required to compile records and the testimony in the absence of [a] statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 [(1974)]. There is no such statute in this state.'
 "Sommerville v. State, 361 So.2d 386, 388
(Ala.Crim.App. 1978)."
926 So.2d at 365. The Court of Criminal Appeals reasoned that although preservation of grand-jury testimony is not required, it is allowed, and it cited Ala. Code 1975, § 12-17-275, which provides:
 "When directed by the judge, [the official court reporter] shall attend the investigations of the grand jury and there take such notes of the testimony as directed by the district attorney or foreman."
The court then concluded that if a trial court was authorized to order the inspection of grand-jury proceedings after a witness had testified at trial, logically it was authorized to order the preservation of the grand-jury proceedings and to make the records so created available to the defense under the appropriate circumstances, as, for example, when a defendant made the required showing under Millican. This Court need not reach the basic question of whether a trial court can order the preservation of grand-jury testimony under certain circumstances because, even accepting that premise, we conclude that no reversible error occurred when the trial court here refused to order the preservation of grand-jury testimony under the circumstances of this case. The Court of Criminal Appeals based its conclusion that reversible error occurred on the following findings: *Page 372 
 "[T]he appellant made a threshold showing that the grand jury proceedings should be preserved. Specifically, he established that there was a genuine concern that there could be inconsistencies between the grand jury testimony and the trial testimony of the medical examiner and/or the investigator. Therefore, the trial court should have ordered that the grand jury proceedings be preserved in some fashion.¹ Subsequently, during the trial, if the defense requested access to grand jury testimony based on alleged inconsistent witness testimony, it could have evaluated the request in light of the standard set forth in Millican [v. State, 423 So.2d 268 (Ala.Crim.App. 1982)].
 "¹We recognize that § 12-16-201, Ala. Code 1975, provides that `[a] grand juror may be required by any court to disclose the testimony of any witness examined before the grand jury for the purpose of ascertaining whether it is consistent with the testimony given by the witness before the court or on a charge of perjury against him.' However, in most cases, a recording or transcript of the actual testimony would be more complete and reliable than a grand juror's testimony, and it would protect the anonymity of grand jurors. Also, if a trial court decided to grant access to a part of the grand jury proceedings, it could take further steps to protect the anonymity of the grand jurors by redacting their names or other portions of the proceedings that may reflect their identities."
926 So.2d at 365.
We disagree with the conclusion of the Court of Criminal Appeals that McKissack made the required showing of the likelihood of inconsistencies between the grand-jury testimony of the medical examiner (also referred to as the coroner) and/or the investigator and their trial testimony. After a careful examination of the record, we agree with the factual analysis presented by Judge Shaw in his dissenting opinion in McKissack:
 "With respect to the testimony of the coroner, the indictment contained in the record reflects that the coroner did not testify before the grand jury; the only witness listed on the indictment is the police investigator. Therefore, even if, as the majority holds, the trial court erred in denying [McKissack's] motion to have the coroner's testimony during the grand jury proceedings recorded, that error was not reversible; it was, at most, harmless.
 "Moreover, although the focus of [McKissack's] argument on appeal appears to be on the coroner, to the extent he is also arguing that the grand jury testimony of the investigator should have been recorded, I disagree with the majority's conclusion that [McKissack] `established that there was a genuine concern that there could be inconsistencies between the grand jury testimony and the trial testimony of the . . . investigator.' At the hearing on [McKissack's] motion to have the grand jury proceedings recorded, [McKissack's] sole argument regarding the investigator was that he had lied during his testimony at the preliminary hearing. According to [McKissack's] counsel, the investigator testified at the preliminary hearing that he had gone to the scene of the crime and searched it with a metal detector in an attempt to find shell casings, but was unable to find any. Counsel asserted that she, too, had gone to the crime scene, and that because the grass at the scene was between three and five feet tall, she believed `there was no way' the investigator *Page 373 
could have used a metal detector. (R. 29.) Counsel argued that because the investigator had testified falsely at the preliminary hearing, she believed he may do so again before the grand jury and that, therefore, [McKissack] was entitled to have the grand jury proceedings recorded for possible impeachment at trial.
 "Counsel's basis for requesting that the investigator's grand jury testimony be recorded was based on an assumption, unsupported by anything other than counsel's bare allegations, that the investigator testified falsely at the preliminary hearing. A transcript of the preliminary hearing is not contained in the record on appeal; therefore, I do not know what the investigator's testimony was or what questions were asked of the investigator. However, even taking counsel's factual allegations regarding the investigator's testimony at the preliminary hearing as true, the record does not support the assumption that the investigator testified falsely. Assuming, as [McKissack] argued, that the investigator testified at the preliminary hearing that he had used a metal detector, but did not testify regarding the length of the grass, this does not indicate false testimony; rather, it suggests only that the investigator was not asked about the length of the grass. The bare assertion of [McKissack's] counsel, based only on her own personal belief, that because of the height of the grass, the investigator could not have used a metal detector does not establish, in my view, `a genuine concern' regarding possible inconsistencies in the investigator's testimony.
 "I also note that the record reflects that the investigator testified at trial that he had gone to the crime scene the day after the crime and had used both dogs and a metal detector in an attempt to find shell casings. He stated that the grass was `real high' and that it was difficult to conduct the search. (R. 164.) The investigator's testimony at the preliminary hearing was entirely consistent with his testimony at trial, and nothing in the record suggests that the investigator's testimony before the grand jury was any different. Under these circumstances, even if the trial court erred in denying [McKissack's] motion to have the grand jury proceedings recorded, any error was harmless."
926 So.2d at 365-66.
The copy of the indictment in the record lists as the "State Witnesses" who appeared before the grand jury only "Inv. Keith Terry, Florence Police Dept." The State made that point to the Court of Criminal Appeals in its application for rehearing and reiterated it in both its petition for the writ of certiorari and the supporting brief, stating in each that "[t]he indictment reflects that Investigator Terry was the only witness to testify before the grand jury during these proceedings." (Petition, p. 4; State's brief, p. 2.) At no point, before either the Court of Criminal Appeals or this Court, has McKissack argued that the medical examiner did testify before the grand jury. Therefore, we rely on the only evidence on point in the record — the above-quoted endorsement on the indictment — and conclude that the medical examiner did not testify before the grand jury. That being the case, the absence of an order to preserve his grand-jury testimony is academic.
Concerning the investigator, Keith Terry, McKissack argued initially before the trial judge, in the presence of the prosecutor, only that "there's some testimony that came out of the preliminary hearing by the investigator that we have concerns about." McKissack's main focus *Page 374 
was on the possibility of testimony by the medical examiner, or someone else, inconsistent with opinions the medical examiner had expressed to McKissack's counsel during private discussions. During a later ex parte conference between the trial judge and McKissack's counsel in the judge's chambers, fully taken down by the court reporter and conducted with the apparent consent of the prosecutor, the following took place:
 "[Defense counsel]: Judge, in our brief we talked about the medical examiner and what the medical examiner has told me. In addition we have reason to believe that Investigator Terry testified falsely at the preliminary hearing. We asked him at the preliminary hearing whether or not he used a metal detector to find other shell casings around the area where the shooting happened and if I can just explain a little bit. [McKissack] and [his] codefendant both gave statements saying they had been shooting the gun earlier in that — in the same general area and that the killing was a result of the decedent playing Russian roulette at a time when both of the other people were asleep. And we asked if he looked for casings in that area and he said that he did and we asked him if did he use the metal detector and he said that he did. And we have photographs which show the level of the grass being this high, and we had been out there at that time with a metal detector also and there was no way that that could have been done, so basically we have reason to believe that he testified falsely with respect to that, because that would obviously go to the credibility of [McKissack]. So we have some concerns about whether or not he will be a truthful witness.
 "BY THE COURT: Grass this high on the record is not gonna show it that high — you're three feet?
 "[Defense counsel]: I'm sorry. Indicate five — three or four high — and like I said, that's something that we'll have to establish at trial but we have concerns based upon what we believe was a material misrepresentation that there will be others. I just wanted to be heard.
"BY THE COURT: All right.
"[Defense counsel]: Thank you."
At trial, Terry testified that a day or two after the crime he returned to the crime scene accompanied by three agents from the Bureau of Alcohol, Tobacco, and Firearms and one of their "explosive-detection dogs." The ATF agents supplied a metal detector. McKissack had earlier told Terry that the revolver had been fired several times during the time the group engaged in "Russian roulette" and that McKissack had thrown the spent shell casings from those firings into the nearby woods. Terry testified that he and the agents searched a fairly extensive area, using "the dog first, the metal detector and then your eyes." They found no shell casings. The next day he arranged to meet McKissack and his attorney at the scene so McKissack could point out where he had thrown the shell casings. Terry then searched the area identified by McKissack, accompanied by other officers, but found no shell casings. During cross-examination by McKissack's attorney at trial, the following exchange took place:
 "Q. . . . Let me start while it's still fresh on my mind with that last search that you did when you went down there when you said where [McKissack] showed you where the shells were back there or where he had thrown them. You didn't have any dogs with you at that point. Was this after the dogs had already searched earlier?
 "A. Yes, sir. That was the next day and it was the same area that we searched with the dog. *Page 375 
 "Q. But the dogs weren't there the second day; is that what you're saying?
"A. No.
 "Q. Did you have a metal detector with you that second day or anything?
"A. No.
 "Q. What was the condition of the grass? Was it real high back there?
 "A. Oh, yeah. I mean these photographs show it. I mean it's pretty high.
"Q. Pretty high and thick grass in that area?
"A. Uh-huh.
 "Q. Does that make it difficult to search — more difficult?
"A. Yes."
At no time did McKissack's attorney suggest to the trial judge that Terry's trial testimony was in any way inconsistent with what he might have said in his testimony before the grand jury. As Judge Shaw noted in his dissenting opinion, Terry's trial testimony was entirely consistent with his earlier testimony at the preliminary hearing.
Moreover, we see no basis for McKissack's attorney to have apprehended that Terry would testify differently before the grand jury than he had at the preliminary hearing concerning the search using the metal detector. If in fact he was being untruthful at the preliminary hearing concerning the use of the metal detector, the natural expectation would be that he would simply "stick to his story" before the grand jury. Certainly the fact that his testimony at trial was consistent with his preliminary-hearing testimony did not serve in any way to indicate the likelihood that he testified differently before the grand jury. Therefore, we find no basis for the conclusion by the Court of Criminal Appeals that McKissack "established that there was a genuine concern that there could be inconsistencies between the grand jury testimony and the trial testimony of . . . the investigator." 926 So.2d at 365. That prong of the "preliminary showing" not having been established, no error, and certainly no reversible error, can be predicated on the failure of the trial judge to order that Terry's testimony before the grand jury be preserved.
Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.*
NABERS, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
* Note from the reporter of decisions: On July 29, 2005, on remand from the Alabama Supreme Court, the Court of Criminal Appeals affirmed, without opinion (CR-02-1845). On August 19, 2005, that court denied rehearing, without opinion. On October 14, 2005, the Supreme Court denied the defendant's certiorari petition, without opinion (1041829).