McMILLAN, Presiding Judge.
The appellant, Patricia Blackmon, was convicted of capital murder in the beating death of her 28-month-old daughter, Dom-iniqua. See § 13A-5-40(a)(15), Ala.Code 1975, which makes capital the intentional murder of a child under 14 years of age. The jury, by a vote of 10 to 2, recommended that Blackmon be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Blackmon to death. This appeal followed.
The State’s evidence tended to show that on May 29, 1999, Blackmon telephoned emergency 911 to summon paramedics to her mobile home in Dothan. She told the 911 operator that her child was not breathing. Eddie Smith, a paramedic in Dothan, testified that he arrived at Blackmon’s mobile home at around 9:30 p.m. and that he found Dominiqua lying on the floor of the master bedroom — she was wearing only a diaper and blood-soaked *407 socks, was covered in vomit, and was not breathing. There was a hematoma on her forehead and blood on her chest. After the paramedics attempted to revive her, she was transported to Flowers Hospital Emergency Room.
Dr. Matthew Krista testified that he treated Dominiqua when she was brought to the emergency room. He said that he first established an airway but that at 10:22 p.m. she was pronounced dead. Dom-iniqua’s pediatrician, Dr. Robert Head, was also called to the emergency room. Both doctors testified that the child had multiple bruises and contusions and an imprint of the sole of a shoe on her chest.[1] They also said that they observed marks from previous injuries on her body.
Dr. Alfredo Parades, the medical examiner who conducted the autopsy, testified that Dominiqua died of multiple blunt-force injuries to her head, chest, abdomen, and extremities — he detailed some 30 injuries that he discovered on the child’s body. Dr. Parades testified:
“She has bruises in the front part of the lower chest and upper abdomen. Bruises around the right groin. She has a fracture, this is the fracture of the leg. And, on her side, she has bruises on the left temporal area above the ear. She has bruises on ... the ear on the left. She had a bruise on the right cheek area. She had a bruise on the side of the heel and foot area. Then on the back, she had multiple bruises on the lower back, bilaterally. That is both sides. Bruises of the buttocks, bruises behind the knee area and below the knee area. And in addition to that, she had numerous linear, what I describe as in parallel, like a train tack. There were numerous injuries with a pale area in between ... the left buttock area.”
(R. 873.) Parades also said that Domini-qua had two broken bones and many other injuries that were in various stages of healing. Parades also described many internal injuries. He said that Dominiqua also had an imprint of the sole of a shoe on her chest.
Dr. James Downs, chief medical examiner for the State of Alabama, testified that he compared the sandals Blackmon was wearing on the day of the murder with the scanned image of the victim’s chest, and it was his opinion that the imprint on Domi-niqua’s chest was consistent with the sole of the sandals. Downs also testified that it was his opinion that Dominiqua’s recent injuries were consistent with having been made by a pool cue.
There was testimony indicating that Blackmon had adopted Dominiqua approximately nine months before she was killed. Testimony also showed that Blackmon had sole charge of the child from the time her father-in-law saw the two of them earlier on the evening of the murder until the time of the child’s death. Wayne Johnson, Blackmon’s father-in-law, testified that on the night Dominiqua was killed he saw Dominiqua and she was playing and acting normal. He said that Blackmon and Dom-iniqua left his house at around 8:00 p.m.
A search of Blackmon’s mobile home revealed several blood-splattered items. Forensic tests revealed the presence of blood on a broken pool cue, a child’s T-shirt, a pink flat bed sheet, a quilt, and two napkins. The blood matched Dominiqua’s blood.
Blackmon called several witnesses to testify in her defense. Judy Whatley, an employee of the Department of Human Resources, said that she had had contact *408 with Dominiqua and Blackmon once a month for five months before August 1998 and that she noticed that the two had a good relationship. Tammy Freeman, Blackmon’s neighbor, testified that she frequently left her children with Black-mon.
The jury convicted Blackmon of capital murder. A separate sentencing hearing was held, at which the State relied on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel to support a death sentence. After the sentencing hearing the jury, by a vote of 10 to 2, recommended that Blackmon be sentenced to death. The circuit court held a separate sentencing hearing after the presentence report was prepared. The circuit court sentenced Blackmon to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-55, Ala. Code 1975.

Standard of Review

Blackmon has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must review this case for plain error. Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
When discussing the application of the plain-error standard of review, this Court has stated:
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex paite Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002). While the failure to object will not preclude our review, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
I.
Blackmon argues that the circuit court erred in denying her motion requesting discovery of the transcript of the grand-jury proceedings. Specifically, she argues that, because she was indicted for capital murder, she had a “special” need to review the grand-jury proceedings.
Blackmon was indicted for capital murder in August 1999. In March 2001, Blackmon moved that she be allowed discovery of the transcript, exhibits, and any other memorialization of the grand-jury proceedings. The motion listed only one ground in support of the discovery of this evidence — that Blackmon had been indicted for capital murder.
*409 Alabama has long protected the secrecy of grand-jury proceedings. See § 12-16-214, Ala.Code 1975. “The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret.” Steward v. State, 55 Ala.App. 238, 240, 314 So.2d 313, 315 (Ala.Crim.App.1975). However, a defendant may be allowed to inspect grand-jury proceedings if the defendant meets the threshold test of showing a “particularized need” for breaching the secrecy of those proceedings. As this Court stated in Millican v. State, 423 So.2d 268 (Ala.Crim.App.1982):
“Before a defendant is allowed to inspect a transcript of a State’s witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343 (1959),] and Pate [v. State, 415 So.2d 1140 (Ala.1981)], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness’ grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant’s testimony. In this case no such showing was made and the existence of any inconsistency between the witness’ trial and grand jury testimony was never even alleged. Cooks [v. State, 50 Ala.App. 49, 276 So.2d 634 (Ala.Crim.App.1973)]. Also, there was no showing that the witness’ grand jury testimony, if available, was ‘of such nature that without it the defendant’s trial would be fundamentally unfair.’ Cooks, 50 Ala.App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321 (1924). (‘Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.’)
“In laying the proper predicate for examination of a witness’ grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
“ ‘When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.’ Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437 [(1966)], cert. dismissed, 280 Ala. 718, 197 So.2d 447 (196[7]).
“Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury ‘differed in any respects from statements made to the jury during trial,’ Pate, supra, and (2) whether the grand jury testimony requested by the defendant ‘was of such a nature that without it the defendant’s trial would be fundamentally unfair.’ Pate, supra. This procedure will best preserve and protect the legislative determination that ‘it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings, remain inviolate.’ Alabama *410 Code 1975, Sections 12-16-214 through 226.”
423 So.2d at 270-71.
Nonetheless, Alabama has no statute that requires that grand-jury proceedings be recorded or otherwise memorialized. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), the defendant argued that the circuit court erred in denying her motion to transcribe the grand-jury testimony. In upholding the circuit court’s ruling, we stated:
“ ‘In Alabama there is no statute requiring that testimony before a grand jury be recorded. “A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 [(Ala.Crim.App.1974)]. There is no such statute in this state.” Sommerville v. State, 361 So.2d 386, 388 (Ala.Cr.App.), cert. denied, 361 So.2d 389 (Ala.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit.’ ”
Stallworth, 868 So.2d at 1139, quoting Hardy v. State, 804 So.2d 247, 287 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000). See also Steward v. State, supra.
At the pretrial hearing on this motion, the prosecutor stated that it was the policy of the district attorney’s office to not record the grand-jury proceedings and that he had no knowledge that the grand-jury proceedings had been recorded in this case. Neither did Blackmon show a “particularized need” to breach the secrecy of the grand-jury proceedings. Based on the cases cited above, we conclude that the circuit court committed no error in denying this motion made after Blackmon had been indicted. Cf. McKissack v. State, 926 So.2d 367 (Ala.2005) (request to preserve grand-jury proceedings was made before grand jury was empaneled).
II.
Blackmon argues that the circuit court erred in denying her motion for a change of venue. Blackmon states in her brief that there was evidence that approximately 60% of the households in Houston County may have been exposed to prejudicial pretrial publicity about the case and that the community was so saturated with pretrial publicity that she could not get a fair trial there. She also asserts that by the very nature of the charge against her, there is a presumption of prejudice.
At the hearing on the motion for a change of venue, two media representatives testified. Bill Perkins, editorial page editor for the Dothan Eagle, testified that he retrieved three articles that had been written about the child’s murder and that the paper circulated to approximately 60% of the households in Houston County. Wayne May, senior reporter for WTVY television station, testified that a number of stories had been broadcast about the case.
After the evidentiary hearing the circuit court issued the following order denying the motion:
“Evidence at the hearing consisted of two witnesses, a representative for the Dothan Eagle and a reporter for WTVY television. The newspaper editor testified that a few newspaper articles were written over a period of time concerning this particular case. The television station ran a number of stories consisting of the same information but repeated *411 during newscasts during the day. The coverage regarding this case has been relatively minor when compared to other ‘high profile’ capital cases. Nonetheless, several editorial opinion pieces were denunciatory but made scant mention of the Defendant....
“The Defendant has failed to show community saturation or even widespread publicity. As stated in ... Or-yang v. State, [642 So.2d 979 (Ala.Crim. App.1993)], ‘... in order for a defendant to show prejudice, the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.’
“It is therefore, ordered, adjudged and decreed that defendant’s motion for a change of venue is hereby denied.”
(C.R. 194-95.)
In Blanton v. State, 886 So.2d 850, 876-77 (Ala.Crim.App.2003), we stated the following concerning a circuit court’s ruling on a motion for a change of venue:
“‘“A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury veni-re. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).”
“ ‘Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).’
“Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). ‘The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.’ Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992). ‘ “Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.” ’ Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
“ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983).’
“Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).”
Here, Blackmon argued that, based on the pretrial publicity and the alleged community saturation, the presumed-prejudice standard applied in this case. In Blanton we discussed the enormous burden that the presumed-prejudice standard imposes on a defendant. We stated:
*412 “For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
“ ‘Hunt relies on the “presumed prejudice” standard announced in Rideau [v. Louisiana, 373 U.S. 723 (1963)], and applied by the United States Supreme Court in Estes [v. Texas, 381 U.S. 632 (1965),] and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: “Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.” 778 F.2d at 1490 (emphasis added [in Hunt ]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“ ‘In determining whether the “presumed prejudice” standard exists the trial court should look at “the totality of the surrounding facts.” Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is “rarely” applicable, and is reserved for only “extreme situations”. Coleman v. Kemp, 778 F.2d at 1537. “In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.” Coleman v. Kemp, 778 F.2d at 1490.
“ ‘Hunt had the burden of showing that “prejudicial pretrial publicity” saturated the community. Sheppard, supra. “[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.” Coleman v. Kemp, 778 F.2d at 1537. “Prejudicial” publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. “Publicity” and “prejudice” are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
[[Image here]]
“ ‘... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, “the appellant must show more than the fact ‘that a case generates even widespread publicity.’ ” Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“ ‘ “ ‘Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunci-atory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [(1945)].’ ”
*413 “ ‘Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).’ ”
886 So.2d at 877-78.
We have reviewed the articles presented in support of the motion for a change of venue. The majority were factual accounts of the murder of the child and of Blackmon’s arrest. There were several editorial articles that denounced Black-mon’s actions; however, very little reference was made to her in those articles. Compared to other capital-murder cases, the publicity in this case was not extensive.
We have also reviewed the voir dire examination of the prospective jurors. Only a handful of the prospective jurors had heard about the case. The voir dire fails to support Blackmon’s claim that the community was saturated with pretrial publicity of the murder. Clearly, Black-mon failed to meet her burden of showing that prejudice was presumed and that a change of venue was warranted. The circuit court correctly denied Blackmon’s motion for a change of venue.
III.
Blackmon argues that the circuit court erred in denying her Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. Specifically, Blackmon argues that the State erroneously removed five of the eight prospective black jurors on the jury venire and, she argues, the reasons given for striking the jurors were not sufficient. In her brief, Blackmon fails to identify any specific juror who was erroneously struck.
The record shows that Blackmon stated that her reason for the Batson objection was that the State removed five of the eight black prospective jurors on the jury venire.[2] The circuit court held that Blackmon failed to make a prima facie case of discrimination, but it nonetheless instructed the State to give its reasons for removing the black jurors.
“Although the trial court acknowledged that the appellant had failed to prove a prima facie case of racial discrimination based solely on these numbers, it nevertheless required the prosecutor to explain his reasons for his strikes. Therefore, we must examine the stated reasons. ‘[Ojnee a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.’ Hernandez v. New York, 500 U.S. 352, 358-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).”
Dallas v. State, 711 So.2d 1101, 1104 (Ala.Crim.App.1997).
“ Tt is within the sound discretion of the trial court to determine if peremptory challenges of black jurors were motivated by intentional racial discrimination. The court’s findings in this regard are afforded great deference and will not be reversed on appeal absent clear error. Ex parte Lynn, 543 So.2d 709 (Ala.1988).’ ”
Ex parte McNair, 653 So.2d 353, 357-58 (Ala.1994), quoting Jelks v. Caputo, 607 So.2d 177, 179 (Ala.1992).
The State gave the following explanations for removing the black prospective *414 jurors: Juror number 17 was removed because she had expressed reservations about imposing the death penalty and because her son had been convicted of a felony. See Click v. State, 695 So.2d 209 (Ala.Crim.App.1996) (a juror’s view on the death penalty is a valid race-neutral reason for striking the prospective juror); Lewis v. State, 741 So.2d 452 (Ala.Crim.App.1999), and Thomas v. State, 611 So.2d 416 (Ala.Crim.App.1992) (fact that family members have prior convictions is valid race-neutral reason for removing juror). Juror number 21 was removed because her son had been prosecuted in Houston County for burglary. Juror number 34 was struck because she knew Louise Johnson, Blackmon’s mother-in-law, who was expected to testify. See Temmis v. State, 665 So.2d 953 (Ala.Crim.App.1994) (fact that prospective juror knows witness is valid race-neutral reason for removing the juror). Juror number 37 was struck because her sister-in-law was in prison for a shooting that occurred in 1998. Juror number 47 was struck because she knew Wayne Johnson, Blackmon’s father-in-law, who was expected to testify. Juror number 58 was struck because she opposed the death penalty.[3]
As the above cited cases demonstrate we have upheld all of the reasons given by the State. The circuit court committed no error in denying Blackmon’s Batson motion.
IV.
Blackmon argues that the trial court erred in denying her motion for a judgment of acquittal because “the State introduced no direct evidence that directly connected Blackmon to any of the alleged causes of death of the victim.” She asserts that there was insufficient evidence that she committed any crime and that she was convicted on “mere conjecture, surmise and speculation.”
This Court’s duty when reviewing a claim on the denial of a motion for a judgment of acquittal is to determine whether there was legally sufficient evidence to support a conviction for the charged offense. See Marlowe v. State, 854 So.2d 1182 (Ala.Crim.App.2002). We review the evidence in a light most favorable to the State. Fitch v. State, 851 So.2d 103, 120 (Ala.Crim.App.2001). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992).
“ ‘Where a defendant’s conviction is based solely on circumstantial evidence, “if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.” Ex parte Brown, 499 So.2d 787, 788 (Ala.1986) (emphasis in original). “Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.” White v. State, 294 Ala. 265, 272, 314 *415 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). “Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.” Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985). “It is not necessary for a conviction that the defendant be proved guilty to the ‘exclusion of every possibility of innocence.’ ” Burks v. State, 117 Ala. 148, 23 So. 530 (1898). “The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.” Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895).’
“White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Accord Williams v. State, 795 So.2d 753, 775 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001).”
Irvin v. State, 940 So.2d 331, 361-62 (Ala.Crim.App.2005).
“[Bjecause intent is a state of mind, it is rarely susceptible of direct or positive proof. Instead, the element of intent must usually be inferred from the facts testified to by the witnesses together with the circumstances as developed by the evidence. Seaton v. State, 645 So.2d 341, 343 (Ala.Crim.App.1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986)). Intent ‘ “ ‘may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.’ ” ’ Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App.1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting, in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980)). Finally, ‘ “[t]he intent of a defendant at the time of the offense is a jury question.” ’ C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), aff'd, 841 So.2d 292 (Ala.2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993).”
Pilley v. State, 930 So.2d 550, 564-65 (Ala.Crim.App.2005).
Blackmon was indicted for capital murder under § 13A-5-40(a)(15), Ala.Code 1975. This section states: “The following [is a] capital offensef ]: .... [mjurder when the victim is less than fourteen years of age.” •
“(a) A person commits the crime of murder if:
“(1) With intent to cause the death of another person, he causes the death of that person or of another person.”
§ 13A-6-2(a)(l), Ala.Code 1975.
The State’s evidence showed that 28-month-old Dominiqua Blackmon was bludgeoned to death with a pool cue. Domini-qua died of multiple blunt-force injuries. There was blood in numerous places in Blackmon’s trailer. The blood matched Dominiqua’s. Approximately two hours before the paramedics were called to Blackmon’s mobile home, Dominiqua showed no sign of any injuries. Blackmon was the sole caretaker of the child during that period. The victim had an imprint of the sole of a shoe on her chest; that imprint matched the sole of the shoes Blackmon was wearing at the time of the murder.
Clearly, the evidence presented by the State was legally sufficient to present the matter of Blackmon’s guilt to the jury for its determination. The circuit court com *416 mitted no error in denying Blackmon’s motion for a judgment of acquittal.
V.
Blackmon argues that the circuit court erred in denying her motion for a new trial. She makes several different arguments in support of this claim.
A.
Blackmon first argues that “the selection of an age factor for alleged victims as a determining factor in liability for capital murder prosecution is arbitrary and capricious, lacking in rational basis.” She asserts that § 13A-5-40(a)(15), Ala. Code 1975, which defines a capital offense as “[m]urder when the victim is less than fourteen years of age” violates her rights to due process and equal protection of the law.
In Ex parte Woodard, 631 So.2d 1065 (Ala.Crim.App.1993), this Court upheld the constitutionality of § 13A-5-40(a)(15), Ala. Code 1975. We stated:
“The child-murder provision is not arbitrary and does not violate any equal protection right.
“ ‘ “The Equal Protection Clause of the Fourteenth Amendment goes no further than to prohibit invidious discrimination .... If there is some reasonable basis for the recognition of separate classes, and if the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the Constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to achievement of the State’s objective; the separate treatment must admit of but one conclusion beyond a rational doubt, i.e., that the basis therefore is arbitrary and unreasonable and without relevance to the legislative goal.” ’
“Goodson v. State, 588 So.2d 509, 514 (Ala.Cr.App.1991) (quoting State v. Thompson, 133 N.J.Super. 180, 336 A.2d 11, 14 (1975)). ‘“Because the statute does not proscribe activities that are legally protected and does not involve any legally cognizable ‘suspect’ class, ‘the classification must be upheld if “any state of facts rationally justifying it is demonstrated to or perceived by the court.” ’ United States v. Holland, 810 F.2d 1215, 1219 (D.C.Cir.), cert. denied, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987).”’ Hardy v. State, 576 So.2d 685, 686 (Ala.Cr.App.1991) (‘ “The legislature of Alabama ‘wanted to lessen the risk that drugs would be readily available to school children. It is surely rational to achieve that goal by increasing penalties for those who sell drugs near schools.’ ” ’). Here, the classification adopted by the Legislature of child-murder as a capital offense is not arbitrary and capricious, but reasonable and appropriate.
[[Image here]]
“It is the holding of this Court that Ala. Code 1975, § 13A-5-40(a)(15) is not unconstitutional.”
631 So.2d at 1073. Other states have likewise upheld child-murder statutes against claims that there is no rational basis for distinguishing the victim’s age when defining a capital offense. See State v. Higgins, 265 Conn. 35, 826 A.2d 1126 (2003) (upheld statute that defined capital murder as murder of child under the age of 16); Henderson v. State, 962 S.W.2d 544 (Tex.Crim.App.1997) (upheld statute that defined capital offense as murder of child under the age of 6). Cf. State v. Smith, 193 Ariz. 452, 974 P.2d 431 (1999) (upheld victim’s age as statutory aggravating cir- *417 eumstance to support imposition of death sentence).
. For the reasons stated in Woodard, Blackmon’s argument is without merit.
B.
Blackmon also makes several different arguments concerning the United States Supreme Court’s decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
The United States Supreme Court in Apprendi held that a fact that increases a penalty above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court applied its earlier holding in Apprendi to death-penalty cases and stated “[cjapital defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increased in their maximum punishment.”[4] Ring, 536 U.S. at 589, 122 S.Ct. 2428.
Since the United States Supreme Court released its decision in Ring, this Court has had numerous occasions to discuss the impact of that case. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to remand), we held that if the aggravating circumstance that elevated the punishment to death was also an element of the capital offense, Apprendi was not violated because the jury’s verdict in the guilt phase found that fact to exist beyond a reasonable doubt. See also Barber v. State, 952 So.2d 393 (Ala.Crim.App. 2005); Pilley v. State, 930 So.2d 550 (Ala.Crim.App.2005); Flowers v. State, 922 So.2d 938 (Ala.Crim.App.2005); Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004); Jones v. State, 853 So.2d 1036 (Ala.Crim.App.2002).
Blackmon first argues that the holding in Apprendi renders Alabama’s death-penalty statute unconstitutional because the jury’s verdict is advisory. In Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002), we specifically held that “Ring did not invalidate Alabama’s law that vests the ultimate sentence determination in the hands of the trial judge and not a jury.” 924 So.2d at 785. We cited the United States Supreme Court’s footnote in Ring, which stated: “Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty.” Ring, 536 U.S. at 597, n. 4, 122 S.Ct. 2428. Also, in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court stated:
“[T]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
859 So.2d at 1190.
Blackmon also argues that the decision in Apprendi mandates that a special verdict form be used so that the jury can designate what aggravating circumstance or circumstances it found to exist. We specifically addressed and rejected this argument in Bryant v. State, 951 So.2d 732, 737 (Ala.Crim.App.2003) (opinion on return to remand). We stated:
“[Bryant] contends that the United States Supreme Court’s decisions in Ap-prendi and Ring mandate the use of such verdict forms.
“This Court has rejected similar claims in previous death-penalty deci *418 sions. See, e.g., Walker v. State, 932 So.2d 140, 159 (Ala.Crim.App.2004); Adams v. State, 955 So.2d 1037, 1105 (Ala.Crim.App.2003). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous cases, that the jury’s verdict finding a defendant guilty of capital murder during the guilt phase of his trial indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5-40(a), Ala. Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory).[5] Moreover, in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed.”
Bryant, 951 So.2d at 750-51.
In this case the only aggravating circumstance that was alleged and found to exist was that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8), Ala.Code 1975. This aggravating circumstance was not an element of the capital offense. However, the circuit court instructed the jury in the penalty phase that it could not proceed to a vote on whether to impose the death penalty unless it first determined that the aggravating circumstance that the offense was especially heinous, atrocious, or cruel was present. The circuit court’s instructions in regard to this issue were very specific and thorough. The jury recommended, by a vote of 10 to 2, that Blackmon be sentenced to death.
“Thus, the jury’s 10-2 vote recommending death established that the jury unanimously found the existence of the ‘especially heinous, atrocious, or cruel’ aggravating circumstance, giving the trial judge the discretion to sentence Duke to death.”
Duke v. State, 889 So.2d 1, 43 (Ala.Crim.App.2002) (footnote omitted), vacated on other grounds by Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), Duke v. Alabama, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005). Thus, there is no Apprendi or Ring violation in this case.
VI.
Blackmon argues that the circuit court erred in denying her motion challenging as unconstitutional her sentence of death by electrocution because the method of imposing the death sentence had been changed.
Blackmon was sentenced to death on June 7, 2002. The Alabama Legislature *419 enacted § 15-18-82.1, Ala.Code 1975, effective July 1, 2002. That statute specifically designates Alabama’s method of execution as lethal injection. Blackmon argues that because the method of execution was changed after her sentence of death by electrocution was pronounced, her sentence of death by electrocution is unconstitutional.
Section § 15-18-82.1(a), Ala.Code 1975, effective July 1, 2002, provides: “A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.” This statute applies to every person on death row in Alabama no matter when his or her sentence of death was pronounced. As the legislature provided in 15 — 18—82.1(d):
“The provisions of the opinion and all points of law decided by the United States Supreme Court in Malloy v. South Carolina, 237 U.S. 180 (1915), finding that the Ex Post Facto Clause of the United States Constitution is not violated by a legislatively enacted change in the method of execution for a sentence of death validly imposed for previously committed capital murders, are adopted by the Legislature as the law of this state.”
Alabama’s change in its method of execution to lethal injection applies to Blackmon and renders this claim moot.
VII.
Blackmon argues that the State failed to prove that the murder was especially, heinous, atrocious, or cruel as compared to other capital murders. Specifically, she argues that the State failed to prove that the victim was conscious during any of her attack and that she suffered.
In Alabama, for the manner of homicide to meet the statutory definition of especially heinous, atrocious, or cruel, the murder must be unnecessarily torturous to the victim. See Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). In making this determination we consider whether the violence involved in the killing was beyond what was necessary to cause death, whether the victim experienced appreciable suffering after a swift assault, and whether there was psychological torture. See Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999).
The circuit court, when considering whether to present this aggravating circumstance to the jury, stated:
“In Nonis, the Court stated that the prosecution offered no evidence from which the Court could reasonably conclude that in that case [the victim] was conscious and aware after he was shot the first time. The only express mention of his state of consciousness was Henson’s testimony that, in his telephone conversation to Norris after Herbert’s funeral he told Norris that Herbert had never regained consciousness. The Court goes on to say, moreover, the prosecution presented no evidence that Herbert would have felt pain in the event he was unconscious. And then there’s a note, Compare Brown v. State[, 663 So.2d 1028, 1034 (Ala.Crim.App.1995)] in which the Court sated, especially heinous, atrocious, or cruel aggravating circumstance was supported by the medical examiner’s testimony that, ‘although the victim was unconsciousness he still would have been able to feel pain.’ Again, Dr. Parades testified to that in this situation. That there is some degree of feeling pain when one is comatose or unconscious. The blow to the skull causing death possible but not likely. Some injuries were inflicted while she was conscious. And that said injuries were painful.”
*420 In the circuit court’s order fixing Black-mon’s sentence at death, the court made the following findings concerning this aggravating circumstance:
“The Court concurs with the jury’s finding that this offense was especially heinous, atrocious and cruel when compared to other capital cases. Numerous physicians testified that approximately 30 fresh wounds were found on the body. One wound to the chest was so forceful as to leave the imprint of a sandal mark on the child’s chest. Evidence also indicated that the child was beaten repeatedly with cue stick. The Defendant argued that the medical experts could not tell the precise order in which the injuries were inflicted nor could they state which injury caused the death of the child. They further argued that it was possible that the first blow killed the child and therefore she would not have experienced pain. However, Dr. Parades testified that bruising would not be caused when the heart is not pumping. He indicated there were over 30 external and internal injuries. The victim would have experienced a lot of pain during the beating. He further stated that the injuries were beyond that needed to cause death. There were pattern injuries that took more than one blow the victim would have been conscious during part of the assault. He further stated the injuries were severe and the pain associated with them would also be severe. While he could not tell the order in which the blows fell he believed that some of the injuries were inflicted while she was still conscious. Dr. Parades stated that it was possible that the blow to the skull could have caused unconsciousness but nonetheless even one who is comatose or unconscious feels some degree of pain. He further stated that the blow to the skull causing death was possible but not likely. He, however, could not tell how long she was alive.
“The Court is convinced beyond a reasonable doubt that this capital murder was heinous, atrocious and cruel when compared to other capital offenses. The Court concurs with the jury’s finding.”
Dr. Alfredo Parades testified at the penalty-phase hearing that Dominiqua had bruises all over her body and that a body will not normally bruise if the heart is not pumping. Parades said that all of the victim’s injuries would have been painful, that they were extensive — more than necessary to cause death — and he believed, based on the extent of the injuries, that Dominiqua was conscious initially and then lost consciousness at some point during the attack.
Evidence also showed that Dominiqua vomited during the beating. The paramedics testified that Dominiqua was covered in vomit. Dominiqua’s blood was also discovered in several areas of the trailer; she had no cloths but a diaper and socks on when she was discovered; and her socks were soaked in blood.
Clearly, there was sufficient evidence for the jury to conclude that the manner of death in this case was especially heinous, atrocious, or cruel when compared to other capital cases. We have consistently held that brutal beatings that result in death meet the statutory definition of especially heinous, atrocious, or cruel. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (1997); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988). Other states have also found that brutal beatings that result in death are especially heinous. See State *421 v. Gerlaugh, 135 Ariz. 89, 659 P.2d 642 (1983) (brutal beating lasting 15 minutes was sufficient to satisfy aggravating circumstance that the murder was committed in an especially heinous, cruel, or depraved manner); Scott v. State, 494 So.2d 1134, 1137 (Fla.1986) (“The brutal senseless beatings which the victim was forced to endure further set this crime apart form the norm of capital felonies and clearly reflect the conscienceless, pitiless and unnecessarily torturous nature of this crime.”); State v. Sepulvado, 672 So.2d 158 (La.1996).
Blackmon brutally bludgeoned to death a helpless two-year-old child using a pool cue and sometime during the beating stomped on her chest. By anyone’s standards the murder in this case was especially heinous, atrocious, or cruel. This aggravating circumstance was correctly found by both the jury and the circuit court.
VIII.
Last, as required by § 13A-5-53, Ala.Code 1975, we review the propriety of Blackmon’s conviction and sentence of death. Blackmon was indicted for, and convicted of, murdering her two-year-old daughter, a violation of § 13A-5-40(a)(15), Ala.Code 1975.
The record reflects that Blackmon’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(l), Ala. Code 1975.
The circuit court’s sentencing order reflects that the court found as the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Section 13A-5-59(8), Ala.Code 1975. We detailed the circuit court’s findings on this circumstance earlier in this opinion and found that this aggravating circumstance was correctly applied in this case. The circuit court found no statutory mitigating circumstance but found the following non-statutory mitigating circumstances that had been presented by defense counsel:
“(1) Patricia Blackmon is a devoted wife. She may have been a devoted wife. However, her husband was in prison and did not testify. He would be in a better position to know if she was a devoted wife instead of other family members. Nonetheless, the Court considered this mitigating circumstance.
(2) Patricia Blackmon is a devoted daughter-in-law. Louise Johnson, the mother-in-law, testified to this fact. The Court also considers this mitigating circumstance.
“(3) The juvenile court of Houston County vested custody of Dominiqua Bryant in Patricia Blackmon. This miti-gator was proved by the evidence and the Court will consider same.
“(4) The Houston County Department of Human Resources gave physical custody of Dominiqua to Patricia Blackmon. This mitigator was proved by the evidence and the Court will consider same.
“(5) Tammy Wigfall repeatedly used Patricia Blackmon as a caregiver for her children. The Court considers this miti-gator.
“(6) Patricia Blackmon has been a positive influence in the Houston County Jail. The Court considers this mitigator.
“(7) Patricia Blackmon is a human being. This mitigator is axiomatic. All people are human beings. The Court considers this mitigator.”
The circuit court weighed the aggravating circumstance and the mitigating circumstances, considered the jury’s recommendation of death, and sentenced Blackmon to death.
Pursuant to § 13A-5-53(b)(2), Ala.Code 1975, we must independently weigh the *422 aggravating circumstances and the mitigating circumstances to determine the propriety of Blackmon’s sentence of death. Blackmon, in a cold and brutal manner, bludgeoned her adopted two-year-old daughter to death with a pool cue. This Court is convinced, after independently weighing the aggravating circumstance and the mitigating circumstances that death was the appropriate punishment in this case.
Neither was Blackmon’s sentence disproportionate or excessive when compared to penalties imposed in similar cases. See Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988).
Last, we have searched the record for any error that may have adversely affected Blackmon’s substantial rights and have found none. See Rule 45A, Ala.R.App.P.
Blackmon’s conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.

. The imprint on the victim's chest was so distinct that a photograph of the victim’s chest introduced into evidence clearly showed the tread of the sole of a shoe.

. Numbers alone are not sufficient to establish a prima facie case of discrimination. The circuit court could have properly denied Blackmon's Batson motion without hearing the State’s reasons for removing the black prospective jurors. Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001).

. The State gave its reasons for removing six prospective black jurors. Apparently the State's last strike, an alternate, was also a black individual. "As provided in Rule 18.4(g)(3), [Ala.]R.Crim.P., ‘The last person or persons struck shall be the alternate or alternates .... ’ Thus, the trial court should view the alternate jurors as having been struck for purposes of Batson and this court must 'evaluate the State’s explanation for striking [the alternate].’ Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala.1993).” Ashley v. State, 651 So.2d 1096, 1099 (Ala.Crim.App.1994).

. The holding in Ring applies to this case because this case was pending on direct appeal when that decision was released. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

. Blackmon was tried before the Alabama Supreme Court released its decision in MeGriff.